NOT FOR PUBLICATION

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

———————————————————— :
                                                       :
GWENDOLYN L. DIXON,                    :
                                                       :
                        Plaintiff,              :            Civil No. 10-5703 (RBK)
                                                       :
            v.                                     :            **OPINION**
                                                       :
MICHAEL J. ASTRUE, Commissioner  :
of Social Security                              :
                                                       :
                        Defendant.           :
———————————————————— :

**KUGLER**, United States District Judge:

This matter comes before the Court on the appeal filed by Plaintiff Gwendolyn L. Dixon

from the decision of the Commissioner of Social Security (the "Commissioner") denying

Plaintiff disability insurance benefits ("DIB") pursuant to Section 205(g) of the Social Security

Act ("the Act"), 42 U.S.C. § 405(g). For the reasons expressed below, the Court will vacate the

Commissioner's decision that Plaintiff is not entitled to DIB and remand the matter to the

Administrative Law Judge ("ALJ").

**I.      BACKGROUND**

**A. Procedural History**

On March 2, 2006, Plaintiff filed an application with the Social Security Administration

(the "Administration") for DIB, alleging that she became disabled on October 28, 2005, due to

neck and back pain resulting from a motor vehicle accident in October 2003, and depression as a

1

consequence of her neck and back pain and inability to work.  Tr. 75.[1]  Plaintiff's claim was

denied.  Tr. 52-56, see also Court Transcript Index.  (The Court notes that the denial of

Plaintiff's claim is undated.[2])  Plaintiff's claim was denied again on reconsideration April 3,

2007.  Tr. 58-60.  Thereafter, on April 14, 2007, Plaintiff requested a hearing before an

Administrative Law Judge ("ALJ").  Tr. 63.  Represented by appointed counsel, Plaintiff

appeared before ALJ Christopher K. Bullard on August 7, 2008.  Tr. 22.  On September 18,

2008, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security

Act at any time between October 28, 2005, Plaintiff's alleged disability onset date, and

September 18, 2008, the date of the ALJ's decision.  Tr. 11.  The Appeals Council denied

Plaintiff's request for review of the ALJ's decision on April 27, 2010.  Tr. 1.

       Seeking district court review of the ALJ's decision, Plaintiff filed an application to

proceed in forma pauperis in the Eastern District of Pennsylvania on June 14, 2010.  Doc. No. 1.

The application was granted on June 18, 2010 (Doc. No. 2), and the Plaintiff filed a Complaint in

the Eastern District of Pennsylvania on June 18, 2010 (Doc. No. 3).  On June 25, 2010, Plaintiff

filed a Request for Appointment of Attorney (Doc. 6), and on July 8, 2010 an Order granting

Plaintiff's Request was issued.  Defendant answered on August 21, 2010.  On October 31, 2010,

Plaintiff's current counsel was appointed.  Plaintiff filed a Motion to Change Venue to the

District of New Jersey on October 29, 2010, and that unopposed motion was granted on

November 1, 2010.

---

[1] The Court notes that the Disability Determination Transmittal lists the filing date of Plaintiff's claim as February 2, 2006 (Tr. 50).  The Court assumes that the correct date for Plaintiff's Application for DIB is the one listed on the Application itself—March 2, 2006.  (Tr. 75).
[2] The claim was likely denied on or soon after July 7, 2006, the date on which the Disability Determination Transmittal ("DDT") was entered.  Court Transcript Index; but see Tr. 50, where DDT appears to be undated.

When Plaintiff failed to file a timely brief, this Court entered a Motion to Dismiss the Complaint for Failure to Prosecute and an Order to Show Cause on June 24, 2011, pursuant to L.Civ.R. 41.1(a).  Doc. No. 14.  Plaintiff filed a Response and Brief on July 12, 2011 (Doc. Nos. 15, 16), and on July 14, 2011, the Court dismissed the Motion and Order to Show Cause (Doc. No. 14).  Defendant filed a timely Response on August 12, 2011.  Doc. No. 18.

**B.  Plaintiff's Physical Condition and Medical History**

Plaintiff's alleged disability is caused by severe back and neck pain that began after a car accident in 2003, and worsened after a spine surgery in 2005.  At the ALJ hearing, Plaintiff described experiencing severe pain "from the nape of [her] neck" that "sweeps down [her] forearms into [her] fingertips."  Tr. 30.  At that time, Plaintiff claimed to be experiencing pain primarily on her left side.  Tr. 30.  She reported experiencing "uncontrollable movements and spasm," and explained that her hands, fingers, and toes were "jarred."  Tr. 30-31.  Plaintiff described pain and fidgeting while sitting: "throughout the day I'm back and forth with sitting, standing and laying down because it needs to be available for me because when the pain flare[s] up and the pinched nerve is staying on my spinal cord . . . ."  Tr. 32.  Plaintiff indicated that her "leg flares up" with pain as well, and that the pain either wakes her while she is sleeping, or prevents her from falling asleep.  Tr. 30.  In addition to experiencing trouble sleeping, Plaintiff reported depression and anxiety "because of the pain that [she] endure[s]," for which she sees a psychiatrist and takes Wellbutrin.  Tr. 29.

Plaintiff described herself as being "limited" in her household chores (Tr. 33); vacuuming was "somewhat exercise" for her, and she could mop and dust with intermittent breaks for sitting.  Tr. 34.  Plaintiff testified that she assists her daughter in cooking, and she and her

3

husband do the shopping together.  Id.  Plaintiff attends church most Sundays, and occasionally visits friends, attends concerts, or goes to the park.  Tr. 34-35.

Plaintiff's relevant medical history began on October 2003, when she was in a motor vehicle accident that resulted in a neck injury.  That accident is the origin of the neck and back pain that, Plaintiff alleges, now prevents her from working.  Tr. 27.  Plaintiff underwent physical therapy for about 18 months following the motor vehicle accident, and received cervical epidural steroid injections on two occasions in 2004.  Tr. 14.  After waiting approximately one year for approval for surgery from her insurance company (Tr. 27), Plaintiff underwent an anterior cervical discectomy and fusion at C5-6 on January 25, 2005.  Tr. 213.  On March 14, 2005, Plaintiff reported to her surgeon, Dr. Orin Atlas, that she was "doing pretty well," indicating that her arm numbness was "50% better" than before the surgery, and that her right side was doing well.  Tr. 247.  On April 11, 2005, after a follow-up appointment, Dr. Atlas reported that x-rays showed Plaintiff's allograft to be "consolidating nicely," and indicated that "her instrumentation [was] in good position."  Tr. 248.  Dr. Atlas also indicated that he was releasing Plaintiff to work "full duty."  Id.

On August 8, 2005, Plaintiff saw Dr. Atlas for another follow-up, and indicated that her pain had returned.  Tr. 249.  Plaintiff reported that "her whole body ache[d] and her arms [felt] different," and she indicated that she had been dropping things for about a month.  Id.  However, Dr. Atlas found her to be neurologically intact on physical examination, and found that Plaintiff's x-rays continued to show good graft consolidation and well-positioned instrumentation.  Id.  Dr. Atlas ordered a magnetic resonance issue ("MRI") of Plaintiff's cervical spine (Id.), but it does not appear that the prescribed MRI was ever obtained.  After Plaintiff's November follow-up, Dr. Atlas indicated again that Plaintiff reported pain in her arms

and neck, as well as burning in her trapezius and arms.  Tr. 250.  Still, Dr. Atlas found Plaintiff to be neurologically intact, with her x-rays showing no problems.  Id.  Dr. Atlas reiterated his recommendation that Plaintiff obtain an MRI of her cervical spine, indicated that Plaintiff would receive nerve conduction studies, and, on Plaintiff's request, wrote her a prescription for Darvocet.  Id.

Plaintiff received an MRI on November 30, 2005.  Tr. 235.  The report indicated that Plaintiff's spinal cord appeared normal, and that there was some change from her pre-surgical MRI at C5-C6.  Id.  There was also "small central disc herniation" at C3-C4 (Tr. 235), which Dr. Atlas later described as "minimal in nature."  Tr. 251.  Nevertheless, Plaintiff presented at the emergency room on December 11, 2005 with "really bad pain," beginning with headaches and including radiation of pain into her arms.  Id.  The next day, Dr. Atlas's physical examination showed that Plaintiff was neurologically intact, that sensation was intact in all nerve root distributions, and other tests were negative.  Id.  Dr. Atlas recommended further evaluation; however, regarding Plaintiff's ability to work, Dr. Atlas indicated the following: "She tells me that she's been out of work, however, I find no reason at the present time that she should be unable to perform her previous duties. . . . It is her decision to remain out of work."  Tr. 251-52.

Plaintiff underwent an electromyography ("EMG") and nerve conduction study on January 10, 2006, performed by Louis Pearlstein, D.O.  Tr. 33.  Dr. Pearlstein found no evidence of neuropathy, but did find that the results of his study were consistent with a C5 radiculopathy on Plaintiff's left side.

On February 20, 2006, Plaintiff saw a pain management specialist, Dr. McMurtrie.  Tr. 265.  On initial examination, Dr. McMurtrie found that Plaintiff suffered "from neck and upper extremity symptoms in the setting of cervical radiculitis with evidence of cervical disc

5

displacement." Tr. 263. Dr. McMurtrie recommended a cervical epidural steroid injection,

which Plaintiff received on February 24, 2006. Tr. 265.

Plaintiff was subsequently evaluated by Dr. Lawrence Foster on May 15, 2006, a

physician with the Division of Disability Determination Services of the New Jersey Department

of Labor. Tr. 273. Dr. Foster "did note particularly an MR from November of 2005 that showed

the changes from the anterior cervical fusion C5 to 6," and showed "small central disk

herniation . . . ." Despite this, he indicates that his evaluation of Plaintiff showed "no objective

findings that substantiate [Plaintiff's] complaints at the time of this examination." Tr. 276. Thus

he found "no need for any hand held assist devices" and that Plaintiff had "the ability to perform

activities of daily living including fine and gross hand manipulation." Id.

On June 26, 2006, a state agency medical consultant, James Paolino, reviewed Plaintiff's

medical file to produce a Physical Residual Functional Capacity ("RFC") Assessment.[3] Tr. 281-

88. Dr. Paolino appears to have reviewed Plaintiff's surgical and pain management history,

history of epidural injections, and MRI reports. Tr. 282. Dr. Paolino summarized the report of

the "Ortho CE" as indicating "no abnormalities, no evidence of radiculopathy." Id. However,

Dr. Paolino found that this conclusion is "not consistent with [the] total evidence," and

concluded that Plaintiff's "symptoms, surgical history, TP findings, [and] MRI are consistent

with arthritis and radiculopathy." Id. Given that diagnosis, Dr. Paolino found that Plaintiff had

---

[3] Plaintiff notes that Paolino "has not signed the report as an MD or DO." Pl. Br. 21. Plaintiff is right to argue that medical evaluations considered by an ALJ must have been conducted by an examining medical doctor or doctor of osteopathic medicine. 20 C.F.R. § 404.1616(b). Moreover, "[w]here the qualifications of a physician do not appear of record his opinion should not be considered." Bryant v. Schweiker, 537 F. Supp. 1, 1 (E.D. Pa. 1982). However, as Plaintiff also points out, the Disability Determination by the SSA indicates "James S Paolino MD" as the physician or medical specialist responsible for Plaintiff's examination. Tr. 50. Given the SSA's identification of Paolino as a medical doctor, as well as Defendant's representation that Paolino is a medical doctor (D. Br. 6, referring to the medical consultant as "Dr. James Paolino"), as well as a confirmatory Internet search, the Court is satisfied that Dr. Paolino meets the requirements of 20 C.F.R. § 1616(b) for a "medical consultant."

the following "Exertional Requirements": she could "frequently" lift and/or carry ten pounds, could stand and/or walk with normal breaks for a total of about six hours of an eight-hour workday, and that she was limited in the upper extremities in her pushing and/or pulling.  Tr. 282.  As far as Plaintiff's "Postural Limitations" are concerned, Dr. Paolino found that, due to "aggravation of cervical arthritis," Plaintiff was able to only "frequently" climb (stairs as well as ladders), and could balance and stoop.  Tr. 283.  However, Plaintiff was only occasionally able to kneel, crouch, and crawl.  Id.  Plaintiff was found to have no manipulative, visual, communicative, or environmental limitations.  Tr. 284-85.  Dr. Paolino found that the "alleged effect on function is consistent with the total medical evidence and nonmedical evidence."  Tr. 286.

Plaintiff was also seen by a neurologist, Susanna Pantelyat, several times between August 28, 2006 and March 28, 2007.  Tr. 297-305.  In her August 28, 2006 report, Dr. Pantelyat indicates that her mental examination, as well as her examination of Plaintiff's cranial nerves, her "motor, sensory and reflexes," and her gait and coordination were all normal.  Tr. 298. Plaintiff's musculoskeletal examination revealed limited range of motion of the spine due to pain and muscle spasms, but otherwise appeared normal.  Id.  Dr. Pantelyat also noted "[s]igns of cervical radiculopathy" in addition to "[m]uscle cramps."  Id.  On December 1, 2006, Dr. Pantelyat reported that an MRI from November 28, 2006 revealed "a small posterior osteophyte with accompanying degenerative disc bulge at C6-7, and a minimal disc bulge at C7-T1."  Tr. 301.  On the basis of that report and her physical examination of Plaintiff, Dr. Pantelyat concluded that Plaintiff experienced cervical radiculopathy and headaches.  Id.  On March 28, 2007, Dr. Pantelyat wrote a note indicating that Plaintiff was experiencing "chronic C5-C6 radiculopathy, with exacerbation on the left," as well as "signs of early sensory neuropathy."  Tr.

305.  That diagnosis appears to have been based on a nerve conduction study performed on

Plaintiff by Dr. Pantelyat on March 24, 2007.  Tr. 304-05.

A June 30, 2008 MRI of the cervical spine indicated "findings similar to that described in

the report of a previous MRI study . . . dated 11/28/06."  Tr. 365.  "No new cervical disc

herniation" was detected.  Id.

In an interrogatory concerning Plaintiff's neurological impairment dated July 20, 2008,

Dr. Pantelyat reiterated her diagnosis of Plaintiff's radiculopathy and early-stage bilateral

sensory neuropathy that was worse on the left side.  She also added that Plaintiff evinced

"chronic regional pain symptoms."  Tr. 360.  Dr. Pantelyat suggested that Plaintiff could stand or

sit for only 15 minutes at a time, and could lift five pounds only on an occasional basis.  Tr. 362.

On July 16, 2008, Plaintiff began to seek treatment from psychiatrist Leon Rosenberg for

her inability to sleep through the night, and for complaints of "depression and anxiety."  Tr. 369.

According to Dr. Rosenberg, Plaintiff was also seeing a psychologist.  Dr. Rosenberg's notes

indicate that Plaintiff traces her psychological symptoms to her motor vehicle accident, as she

felt "she is no longer a partner to her husband," and "is sad about having lost her [day care]

business."  Tr. 370-71.  After Plaintiff's July 24, 2008 visit to Dr. Rosenberg, he described her as

being "with a severe depression."  Tr. 368.  On July 29, 2008, Plaintiff was "starting to look

happier in [sic] better in general."  Dr. Rosenberg decided to raise Plaintiff's dose of Wellbutrin,

as Plaintiff, seeing "she is starting to improve," felt "ready" for the increase.  Tr. 367.

**C.  Plaintiff's Work History**

Plaintiff worked in the electronics industry from late 1986 to early 1999.  Tr. 111.  She

worked for several different companies, and performed work ranging from soldering to

assembling products from blueprints, to inputting data into computers.  Tr. 111-14.  In 1999,

Plaintiff began to work as a "residential home day care provider" (Tr. 115) at a business that she

started (Tr. 28). Plaintiff describes her day care work as physically taxing, requiring "crawling

and moving around on [the] floor a lot," carrying infants, "kneel[ing] down or stoop[ing]." Tr.

115.

Plaintiff also records several other sources of employment during the time when she ran

her day care business. Tr. 111. She worked at Target, stocking and shelving items in the store,

and for an office cleaning company in 2002. Tr. 116-17. In 2003, Plaintiff also worked

occasionally as a substitute in a residential home. Tr. 118. As described in Section I.C, infra,

Plaintiff was injured in a motor vehicle accident in 2003 and underwent remedial spine surgery

in 2005. Plaintiff explains that, after her surgery, she was no longer able to keep up with the

physical demands of her day care business. Tr. 28. Plaintiff last returned to work for about one

month in 2007, as a surface mount and solderer. Id. She describes that job as involving "fine

work" that caused her "eye strain," "fatigue," and "restlessness." (Tr. 28-29). The ALJ found

that Plaintiff's earnings for that work were insufficient to constitute "substantial gainful

activity." Tr. 13.

### D. Testimony of the Vocational Expert

A vocational expert, William Slaven, also testified at the hearing before the ALJ. The

ALJ proposed to the vocational expert the following hypothetical, meant to capture the work

capability of an individual with the same characteristics as Plaintiff:

> [A]ssume for the purpose of a hypothetical question an individual who is 46 years of age.
> Assume this individual has a high school education. Assume this individual has the
> following exertional limitations. Assume this individual can sit for up to one hour.
> Assume this individual can sit for a total of six hours out of eight in the work day.
> Assume this individual can stand for 15 minutes at a time. Assume this individual can
> stand for a total of two hours out of eight in the work day. Assume this individual can
> walk for up to 15 minutes at a time. Assume this individual can walk for a total of one

hour out of eight in the work day.  Assume this individual can lift and carry ten pounds on an occasional basis, less than ten pounds on a frequent basis.  Assume this individual can handle and feel only on a frequent basis with the non dominant left hand.  Tr. 44-45.

Presented with these limitations, the vocational expert determined that the Plaintiff was not capable of performing any work relevant to her past occupations.  Tr. 44-45. The vocational expert found that, although one sedentary job—data entry clerk—that was relevant to Plaintiff's prior work was available, "handling and feeling would be constant" for such a position, and the individual in the ALJ's hypothetical would be barred from such work because of the limited use of her non-dominant hand.  The vocational expert then indicated that the following jobs exist in the national economy that the hypothetical individual would be capable of performing: telephone information clerk (over one million jobs in the country, and one thousand jobs in the region), charge account clerk (over one million jobs in the country, and 1,500 jobs in the region), and surveillance system monitor (over two million jobs in the country, and 1,200 hundred jobs in the region).  Based on the vocational expert's findings, the ALJ found that these jobs, which Plaintiff was capable of performing, existed in significant numbers in the national economy.  Tr. 20.

## II.   STANDARD FOR REVIEW OF COMMISSIONER'S DECISION

District court review of the Commissioner's final decision is limited to ascertaining whether the decision is supported by substantial evidence.  Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999) (citing 42 U.S.C. § 405(g)).  Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Morales v. Apfel, 225 F.3d 310, 316 (3d Cir. 2000) (quoting Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999)).  If the Commissioner's determination is supported by substantial evidence, the Court may not set aside the decision, even if the Court "would have decided the factual inquiry differently."  Fargnoli v. Masanari, 247 F.3d 34, 38 (3d Cir. 2001)

(citing Hartranft, 181 F.3d at 360).  A district court may not weigh the evidence "or substitute its conclusions for those of the fact-finder."  Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992).

Nevertheless, the reviewing court must be wary of treating "the existence vel non of substantial evidence as merely a quantitative exercise" or as "a talismanic or self-executing formula for adjudication."  Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983) ("The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.").  The Court must set aside the Commissioner's decision if the Commissioner did not take into account the entire record or failed to resolve an evidentiary conflict.  Schonewolf v. Callahan, 972 F. Supp. 277, 284-85 (D.N.J. 1997) ("Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.") (quoting Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978)).  Furthermore, evidence is not substantial if it constitutes "not evidence but mere conclusion," or if the ALJ "ignores, or fails to resolve, a conflict created by countervailing evidence."  Wallace v. Sec'y of Health & Human Servs., 722 F.2d 1150, 1153 (3d Cir. 1983) (citing Kent, 710 F.2d at 114).

## III.    DISCUSSION

In order to qualify for DIB, a claimant must establish that he is disabled.  42 U.S.C. § 423(a)(1)(E).  A claimant is disabled if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less

than 12 months."  42 U.S.C. § 423(d)(1)(A).  The claimant's impairment(s) must prevent him not only from doing his previous work, but also from "engag[ing] in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

The Commissioner conducts a five-step inquiry to determine whether a claimant is disabled.  20 C.F.R. § 404.1520; Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004).  The Commissioner first evaluates whether the claimant is currently engaging in a "substantial gainful activity."  Such activity bars the receipt of benefits.  20 C.F.R. § 404.1520(a).  The Commissioner then ascertains whether the claimant is suffering from a severe impairment, meaning "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  If the Commissioner finds that the claimant's condition is severe, the Commissioner determines whether it meets or equals a listed impairment.  20 C.F.R. § 404.1520(d).  If the condition is equivalent to a listed impairment, the claimant is entitled to benefits; if not, the Commissioner continues to step four to evaluate the claimant's RFC and analyze whether the RFC would enable the claimant to return to his "past relevant work."  20 C.F.R. § 404.1520(e).  The ability to return to past relevant work precludes a finding of disability.  If the Commissioner finds the claimant unable to resume past relevant work, the burden shifts to the Commissioner to demonstrate the claimant's capacity to perform work available "in significant numbers in the national economy." Jones, 364 F.3d at 503 (citing 20 C.F.R. § 404.1520(f)).

The ALJ began his analysis in this case by finding that Plaintiff met the insured status requirements of the Social Security Act through March 31, 2006.[4]  Tr. 13.  Proceeding to the

---

[4] The Court notes that the ALJ's review raises as "an additional issue" the question of whether Plaintiff meets the insured status requirements of Sections 216(i) and 223 of the Act, 42 U.S.C. §§ 416(i), 423.  Tr. 11.  The ALJ's

five-step disability inquiry, the ALJ also found that, although Plaintiff had worked briefly after her alleged onset set (October 28, 2005), her work did not constitute substantial gainful activity, and she therefore met the first disability requirement.  Tr. 13, see also 20 C.F.R. § 404.1520(a). The ALJ then found that Plaintiff did suffer from a "severe combination of impairments: spondylotic hypertrophy, radiculopathy, stenosis, cervical discectomy and fusion and cervical spondylosis."  Id.; see also 20 C.F.R. § 404.1521.  However, the ALJ found that, although Plaintiff had recently been diagnosed with depression, the record showed that her symptoms were "mild."  Id.  Accordingly, the ALJ found that Plaintiff's depression was not a severe impairment for the purposes of disability analysis under 20 C.F.R. § 404.1521.  Tr. 13-14. Proceeding to step three of the five-step analysis, the ALJ determined that Plaintiff's severe impairment did not "meet[] or medically equal[] one of the listed impairments."  The ALJ then found that Plaintiff

> has the residual functional capacity to; lift and carry up to ten pounds occasionally and less then [sic] ten pounds frequently, sit for six hours (in one hour intervals) in an eight hour workday; stand for two hours (in fifteen minute intervals) in an eight hour workday and walk for one hour (in fifteen minute intervals) and can never climb ladders, but can occasionally climb stairs, bend/stoop and can frequently handle and feel with her non-dominant left hand.  Tr. 16.

decision indicates that "the claimant has acquired sufficient quarters of coverage to remain insured through March 31, 2006."  Id.  Thus, the ALJ continues, "the claimant must establish disability on or before that date in order to be entitled to a period of disability and disability insurance benefits."  Id.  However, the ALJ goes on to conclude that "the claimant has not been under a disability within the meaning of the Social Security Act from October 28, 2005 *through the date of this decision*."  Id. (emphasis added).  Likewise, Defendant Commissioner's brief explains that "[t]he issue is whether substantial evidence supports a finding that Plaintiff was not under a disability within the meaning of the Act from October, 28 2005 . . . through September 18, 2008, the date of the ALJ's decision."  Def. Br. Pursuant to Loc. Civ. R. 9.1, at 1.

Accordingly, the Court finds that the ALJ and Defendant Commissioner do not dispute that Plaintiff's alleged symptoms and medical reports dated after March 31, 2006 (Plaintiff's last-insured date) do, indeed, relate back to the period during which Plaintiff had insured status, and would constitute "retrospective diagnosis" of her alleged impairment.  See Newell v. Comm'r of Soc. Sec., 347 F.3d 541, 547 (3d Cir. 2003) ("Retrospective diagnosis of an impairment, even if uncorroborated by contemporaneous medical records, but corroborated by lay evidence relating back to the claimed period of disability, can support a finding of past impairment."); see also, Wooldridge v. Bowen, 816 F.2d 157, 160 (8th Cir. 1987) (holding that "medical evaluations made subsequent to the expiration of a claimant's insured status are not automatically barred from consideration and may be relevant to prove a previous disability").

This RFC, the ALJ determined, meant that Plaintiff was unable to perform any past relevant work.  Tr. 19, see also 20 C.F.R. § 404.1565.  After consulting with the vocational expert, the ALJ then performed the final step of the disability analysis.  He concluded that, "considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant [could] perform."  Tr. 19, see also 20 C.F.R. §§ 404.1560(c), 404.1566.

Plaintiff claims that the ALJ erred in six ways.  First, Plaintiff argues that the ALJ erred in giving greater weight to the opinion of a non-examining state agency physician who had not reviewed all relevant medical evidence, than to the opinion of Plaintiff's treating physicians.  Pl. Br. 5.  Second, Plaintiff claims that the ALJ erred by "substituting his own opinions as to the significance of medical evidence without any basis in the record."  Pl. Reply Br. 4.  Third, Plaintiff contends that the ALJ failed to properly assess the Plaintiff's subjective complaints of pain.  Id. at 7.  Fourth, Plaintiff argues that the ALJ erred in determining that Plaintiff's depression was not a severe impairment.  Id. at 8-9.  Plaintiff further argues that, even if that determination were correct, the ALJ erred in failing to factor Plaintiff's depression into the RFC assessment.  Id.  Plaintiff's fifth argument is that the ALJ failed to properly develop the medical record by not adequately considering Plaintiff's depression, and by considering a report proffered by an unrecognized source.  Pl. Br. 5.  Finally, Plaintiff claims that the ALJ presented the vocational expert with a flawed hypothetical, which led to a misunderstanding of Plaintiff's capacity to work.  Pl. Reply Br. 11.  These arguments are addressed in turn below.

**A. The ALJ Gave Proper Weight to the Opinion of a Non-Examining State Agency Physician**

Plaintiff argues that the ALJ erred in accepting the opinion of a non-examining state agency physician over that of treating physicians when the non-examining doctor did not have all relevant medical evidence.  Specifically, Plaintiff argues that the ALJ erred in giving undue weight to Dr. Paolino's opinion, because Dr. Paolino was not an examining physician, and Dr. Paolino wrote his evaluation before Plaintiff began her visits to Dr. Pantelyat.  In this case, although Dr. Pantelyat's evaluation conflicted with Dr. Paolino's assessment, Dr. Paolino's findings do appear to be supported by other sources in the record.  Moreover, the ALJ did not rest his findings on Dr. Paolino's report alone; rather, the ALJ considered many reports in the record, including those of Dr. Pantelyat.  Thus the ALJ did not give undue weight to a non-examining state agency physician.

An ALJ may give weight to the opinions of non-examining state physicians when the administrative record supports those opinions.  See Jones v. Sullivan, 954 F.2d 125, 129 (3d Cir. 1991) (noting that there are circumstances in which an ALJ may consider opinions of non-examining state agency physicians when those opinions contradict the opinions of treating physicians).  Here, the non-examining physician, Dr. James Paolino, found that Plaintiff suffered from arthritis and radiculopathy.  Tr. 282.  This was consistent with the report of examining physician Dr. McMurtrie, who diagnosed Plaintiff as suffering from cervical radiculopathy.   Tr. 265.  Thus there is support for Dr. Paolino's opinion in the record.  Furthermore, Dr. Paolino's assessment offers a thorough evaluation of the reports by Plaintiff's examining physicians— some of which, Dr. Paolino found, actually underestimated the level of Plaintiff's impairment See Tr. 282 (finding that a report showing that Plaintiff manifested "no abnormalities, [and] no

15

evidence of radiculopathy" was "not consistent with [the] total evidence").  Given the support for

Dr. Paolino's assessment, and the evidence that he carefully examined the evidence before him,

the Court finds that the ALJ did not err in finding that Dr. Paolino's assessment was "an accurate

analysis of the claimant's functional abilities," despite the fact that Paolino "did not have access

to the entire record."  Tr. 18-19.

Moreover, the ALJ's opinion does not rest on Dr. Paolino's findings alone, and it does

carefully consider the conflicting opinion of Dr. Pantelyat.  However, the ALJ determined that

the opinions of Plaintiff's other treating physicians—namely Dr. Atlas and Dr. Foster—

contradicted Dr. Pantelyat's opinion, and were more credible.  Tr. 18.  As the ALJ noted, "it

appears that Dr. Pantelyat has based her opinion about the severity of the claimant's limitations

entirely on the claimant's own reports of pain."  Tr. 18.  Moreover, the ALJ found that "Dr.

Pantelyat's assessment appears to be inconsistent with Ms. Dixon [sic] testimony," since Plaintiff

testified that she does perform some housekeeping and social activities that "suggest some ability

for [her] to perform work activity."  Tr. 18.

The ALJ thus provided some basis for his greater reliance on the reports of Dr. Atlas and

Dr. Foster—examining physicians—than those of Dr. Pantelyat.  The Third Circuit has held that

an ALJ "may afford a treating physician's opinion more or less weight depending upon the extent

to which supporting explanations are provided."  Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir.

1999).[5]  In this case, the opinions of several of Plaintiff's examining physicians conflict with Dr.

Pantelyat's, and the ALJ offered sufficient reason for giving less weight to the opinion of Dr.

Pantelyat than to Dr. Atlas, Dr. Foster, and Dr. McMurtrie.  Although the ALJ did give weight to

---

[5] Moreover, an ALJ may even decide to give a treating physician's opinion no weight at all, if that decision is made
"on the basis of contradictory medical evidence" (Id.), such as the contradictory  medical opinions that the ALJ cites
here.

Dr. Paolino's opinion, which was presented before Plaintiff saw Dr. Pantelyat, Dr. Paolino's opinion was supported by the administrative record.  More importantly, the ALJ did not fail to take into account Dr. Pantelyat's opinion, and he appropriately weighed it against contrary evidence.

**B.  The ALJ's Inclusion of His Own Assessment of Medical Evidence Was Harmless Error**

Plaintiff argues next that the ALJ erred in inserting his own opinion of the medical evidence into his opinion.  Explaining that "Dr. Foster's examination failed to reveal any residuals of radiculopathy," the ALJ continues as follows: "[t]he undersigned notes that signs of muscle wasting or atrophy are usually observed when pain is severe and functionally limiting." Tr. 17.  Plaintiff correctly contends that there is nothing in the record to support this assertion. Indeed, as Plaintiff argues, "an ALJ is not free to employ her own expertise against that of a physician who presents competent medical evidence."  Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999).  In this case, however, although the ALJ's own medical assessment was improperly included in the ALJ's opinion, the ALJ's assessment was not, in fact, employed "against that of a physician who presents competent medical evidence."  In fact, the ALJ's opinion supported Dr. Foster's finding that "[i]t should be noted that there were no objective findings that substantiate her complaints at the time of this examination."  Tr. 276.  Thus, although the ALJ erred in including his personal assessment of Dr. Foster's evaluation, the ALJ's conclusion regarding Dr. Foster's opinion was nevertheless supported by substantial evidence.  The ALJ's improper assessment was merely extraneous, and did not contradict the examining physician's findings.

### C.  The ALJ Properly Assessed Plaintiff's Subjective Complaints of Pain

Plaintiff contends that the ALJ erred in failing to properly account for Plaintiff's subjective complaints of pain.  The Court finds that the ALJ did adequately consider both Plaintiff's testimony and the medical records wherein Plaintiff complained of pain.  As the ALJ indicates, "whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the [ALJ] must make a finding on the credibility of the statements based on a consideration of the entire case record."  Tr. 17; see also Mason v. Shalala, 994 F.2d 1058, 1067 (3d Cir. 1993) (finding that an ALJ must give "serious consideration" to a claimant's complaints of pain, but also that the ALJ must make a credibility determination where claimant's complaints are unsupported by the evidence).  In this case, the ALJ did find that Plaintiff experienced pain; indeed, he found "objective evidence in the record to support some physical limitations. . . ."  Tr. 17.  However, the ALJ also found that the limitations were "not of the intensity, frequency, or duration alleged" by Plaintiff.  Id.  As explained in Section III.A supra, the ALJ reviewed the reports of physicians who found that Plaintiff experienced some pain, but who concluded that Plaintiff's allegations of pain were unsupported.

Moreover, the ALJ found persuasive Plaintiff's own testimony that "she vacuums, mops, dusts, and does some cooking, and that she does the shopping with the assistance of her husband."  Id.  This led him to believe that Plaintiff's ability to do work activities was not as impaired as Plaintiff claimed, especially since Plaintiff testified that she occasionally drives, goes to church, attends school functions, and attends social gatherings.  Id.  Plaintiff argues that her testimony was only that she could occasionally perform these activities, and that she performed them with difficulty.  Pl. Br. 24.  However, on considering testimony and other evidence, an ALJ

18

is "entitle[d] to draw an inference adverse" to Plaintiff's. <u>Mason v. Shalala</u>, 994 F.2d at 1068.

What is required is that the ALJ give "due consideration" to the medical evidence in the records

when drawing his inferences (<u>Id.</u>), which the ALJ has adequately done here.

**D.  The ALJ Erred in Failing to Consider Plaintiff's Depression in the RFC Analysis**

Plaintiff argues that the ALJ erred in determining that Plaintiff's depression was not

severe.  Moreover, Plaintiff argues, even if the ALJ's assessment of the severity of her

depression was incorrect, nevertheless the ALJ erred in failing to incorporate Plaintiff's

depression into the RFC analysis that followed.  The Court affirms the ALJ's determination that

Plaintiff's depression was not severe.  However, the Court finds that the ALJ erred in failing to

account for Plaintiff's depression when evaluating her RFC, or in failing to explain why

Plaintiff's depression did not need to be included in the RFC evaluation.

The ALJ properly concluded that Plaintiff's depression was not severe.  A severe

impairment is one that "significantly limits [one's] physical or mental ability to do basic work

activities."  20 C.F.R. § 1520(c).  The ALJ examined the records from Dr. Leon Rosenberg,

Plaintiff's treating psychiatrist, who recorded that Plaintiff was "starting to look happier in [sic]

better in general" after less than two weeks of treatment.  Tr. 367.  Although one of Dr.

Rosenberg's reports indicates that Plaintiff had "a severe depression," another report of Dr.

Rosenberg's suggests that it might be "therapeutic" for Plaintiff to "do some volunteer work in a

day care."  Tr. 371.  This strongly signals that, according to Plaintiff's treating psychiatrist,

Plaintiff's depression did not severely limit her ability to do basic work activities.  Moreover, Dr.

Rosenberg found "evidence of depression," but found no hallucinations, no evidence of anxiety,

no evidence of anger (though Plaintiff complained of anger), and no suicidal thoughts.  Tr. 370.

Furthermore, the Administration follows the following guidelines for evaluating a claimant's

"mental ability": "[a] limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting, may reduce your ability to do past work and other work."  20 CFR 404.1545.  However, Dr. Rosenberg found Plaintiff to be "cooperative" and noted that her "[m]emory appeared to be intact."  He noted no limitations in Plaintiff's ability to carry out mental activities.  Finally, Dr. Rosenberg assigned Plaintiff a Global Assessment of Functioning ("GAF") rating of 65, which, as Plaintiff concedes, indicates "[s]ome mild symptoms . . . OR some difficulty in social, occupational, or school functioning . . ., but generally functioning pretty well . . . ."  Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000) ("DSM-IV-TR").[6]  Therefore, the ALJ properly found that Plaintiff's depression was not a severe impairment.

However, Plaintiff is correct in her contention that, even if the ALJ was correct in determining that her depression was not severe, nevertheless the ALJ erred in failing to factor Plaintiff's claims of depression into the RFC analysis.  As the Third Circuit has explained, where the ALJ "discount[s] pertinent evidence before him in making his residual functional capacity determination," he must "consider and explain his reasons" for doing so.  Burnett v. Commissioner of Social Sec. Admin., 220 F.3d 112, 121 (3d Cir. 2000).  The ALJ is permitted to "weigh the credibility of the evidence"; however, he must "give some indication of the evidence which he rejects and his reason(s) for discounting such evidence."  Id.  "In the absence of such

---

[6] Plaintiff correctly points out that the Social Security Administration does not explicitly endorse the use of the GAF scale in disability determinations because that scale "does not have a direct correlation to the severity requirements of these programs." 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000) (Soc. Sec. Admin., Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury) (emphasis added).  The Administration does not, however, state that the GAF scale should not be used in evaluating a Plaintiff's claimed impairments.  Furthermore, in this case, the GAF score assigned to Plaintiff appears to match Dr. Rosenberg's other findings.

an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981).

In this case, the ALJ properly evaluated Plaintiff's depression to determine that it was not severe. Tr. 13. However, after making that determination, the ALJ neglected to factor Plaintiff's depression into the RFC analysis, and he failed to offer a reason for leaving Plaintiff's depression out of that analysis. Tr. 16 at ¶ 5 (failing to list depression in assessment of Plaintiff's residual functional capacity). Cf. 20 CFR 404.1545 (In evaluating RFC, "[w]e will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe' . . . ."). Moreover, the ALJ failed to include any depression-related impairments in the hypothetical question posed to the vocational expert. Tr. 44. Thus the ALJ's failure to either consider Plaintiff's depression in evaluating her RFC or to offer a reason for discounting it was unsupported by substantial evidence.

**E.  The ALJ Did Not Err in Failing to Account for an Unsigned Medical Evaluation**

Plaintiff next takes issue with the ALJ's failure to develop the record further with regard to an unsigned medical report from an unknown source who, it appears, did not examine the Plaintiff. See Tr. 380-83. Generally, an ALJ may give weight to the opinions of non-examining state physicians when the administrative record supports those opinions. See Jones v. Sullivan, 954 F.2d 125, 129 (3d Cir. 1991) (noting that an ALJ may consider opinions of non-examining state agency physicians when those opinions contradict the opinions of treating physicians). However, this Court has found that, where the signature of a state agency physician is illegible, and the "qualifications of [the] physician do not appear in the record," the ALJ may accord no weight to the physician's opinion. Patterson v. Astrue, 2011 U.S. Dist. LEXIS 92876 at *25

(citing <u>Cannon v. Heckler</u>, 627 F. Supp. 1370, 1375 (D.N.J. 1986) ("Since the [non-examining physician's] signature is illegible and the name and qualifications of the physician unknown, the form should have been given <u>no</u> weight.") (internal citations omitted)).  Thus, if the ALJ relied on a medical report from an unknown official, the Court may vacate the ALJ's opinion and remand the matter on these grounds alone.

In this case, although the record contains an illegibly signed report from an unknown source, and the ALJ's opinion refers to that source, the ALJ notes that it "gives little weight to [that] assessment."  Tr. 18.  Moreover, the ALJ's treatment of the report reflects that the ALJ did, in fact, give no weight at all to the assessment.  The ALJ indicates that the unsigned report "does not offer any medical evidence to support its conclusions," and also states that "the findings appear to be internally inconsistent."  <u>Id.</u> (noting that the unsigned report finds "<u>no limitations</u>" on Plaintiff's ability to walk or stand, but also "finds that the claimant is unable to sit for six hours in a workday").

Thus the ALJ did not give any weight to the anonymous medical report.  However, Plaintiff argues that the ALJ should have made inquiries into the origin of the report.  It is true that the ALJ had a duty "to investigate the facts and develop the arguments both for and against granting benefits."  <u>Sims v. Apfel</u>, 530 U.S. 103 (2003).  There appears to be no justification, however, for the notion that it is incumbent upon an ALJ to inquire into the authorship of each report in a claimant's voluminous medical records.  The courts simply point out that, if the authorship of a given record is uncertain, that record should not be given any weight—and in this case, the ALJ accordingly did not give the unsigned report any weight.

Plaintiff also argues that the ALJ failed to fully develop the record with regard to Plaintiff's depression.  However, there is no basis for Plaintiff's assumption that the ALJ

required more evidence than that which was in the record to make a conclusive determination that Plaintiff's depression was not severe.  Though an ALJ has a duty to develop the factual record in each case, this does not include a duty to order more examinations simply because a Plaintiff does not manifest a severe impairment.

**F.  The ALJ Failed to Make Proper Findings Regarding the Functionality of Plaintiff's Hands**

Finally, Plaintiff complains that the ALJ erred by using a flawed hypothetical situation to assess the jobs that Plaintiff's RFC would allow her to perform.  As indicated in Section I.D supra, at the hearing before the ALJ, the ALJ presented the vocational expert with a hypothetical question that included the Plaintiff's physical limitations, as established through the medical record and Plaintiff's testimony.  As part of that hypothetical, the ALJ asked the vocational expert to "[a]ssume this individual can handle and feel only on a frequent basis with the non dominant left hand."  Tr. 44.  The ALJ's hypothetical question, Plaintiff argues, did not include a limitation on the hypothetical worker's dominant hand; thus, Plaintiff objects, the vocational expert presented the ALJ with categories of employment that required use "primarily" of the dominant hand "on a frequent basis."  Tr. 45.

It is unclear from the record to what extent Plaintiff is limited in the use of her hands, specifically with regard to which hand is more limited.  The Court notes Plaintiff's testimony that, although the pain she experienced "was both right and left"-sided, it "is basically left sided right now."  Tr. 30 (emphasis added).  Thus the ALJ may have concentrated his hypothetical question on the limitations of Plaintiff's non-dominant hand because Plaintiff's statement led him to the conclusion that the pain in her left hand was more severe.  However, the ALJ opinion indicates that, according to the vocational expert's testimony, Plaintiff "had no transferable

23

skills, because of limitations with the use of her <u>right</u> hand." Tr. 19 (emphasis added).  If this is

the case, then Plaintiff is correct that the ALJ should have included in his hypothetical question a

limitation on the function of the hypothetical worker's dominant hand.  It is possible that the ALJ

erroneously wrote "right hand" where he meant to write "left hand" in his opinion; however, the

Court declines to speculate on what the ALJ meant, given that there is medical evidence that

would support a finding of pain in both Plaintiff's right and left hands.  The Court therefore finds

that, in failing to adequately develop the record to address potential limitations on the function of

Plaintiff's right hand, the ALJ "fail[ed] to resolve[] a conflict a created by countervailing

evidence."  <u>Wallace v. Sec'y of Health & Human Servs.</u>, 722 F.2d 1150, 1153 (3d Cir. 1983)

(citations omitted).  The ALJ's decision is therefore unsupported by substantial evidence.

## III.    CONCLUSION

For the foregoing reasons, the Court finds that substantial evidence does not support the

ALJ's determination that Plaintiff is not entitled to DIB.  As a result, the Court will vacate the

ALJ's decision and remand the matter to the ALJ for further proceedings consistent with this

Opinion.  An appropriate order shall enter today.


Date:   9-26-2011                                         /s/ Robert B. Kugler
                                                          ROBERT B. KUGLER
                                                          United States District Judge

24